IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:06CV531

SECURITIES AND EXCHANGE COMMISSION,　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　Plaintiff,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　　　　　　)　　　ORDER
　　　　　　　　　　　　　　　　　　　　　　)
JOHN F. MANGAN, JR.,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　Defendant.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
_____)

This matter is before the court upon the parties' cross-motions for summary judgment.

**BACKGROUND**

This lawsuit arises out of a short sale of stock[1] in a company called CompuDyne Corporation ("CDCY") made by the Defendant, John F. Mangan ("Mangan"). In 2001, CDCY was a company in the public safety and security business. In the months prior to September 11, 2001, CDCY stock traded at around $8-$9 per share, with daily volume not exceeding 18,400 shares. Between September 17, 2001 (the day the stock market reopened after the terrorist attacks of September 11) and October 8, 2001, CDCY common stock experienced extremely volatile trading at prices ranging from $9.33 to $19.55, in daily volume ranging from 71, 500 shares to 749,400 shares.

After September 11, 2001 CDCY engaged Friedman, Billings, Ramsey ("FBR"), an SEC

---

[1] A "short sale" refers to the sale of a security not owned by the seller. It is a technique typically used by an investor to take advantage of an anticipated decline in the price of a stock. The short position is then covered by shares purchased at the lower price.

1

registered broker-dealer, to act as a financial advisor and underwriter to assist it in raising capital through a private investment in public equity, otherwise known as a "PIPE."[2] Mangan at that time was employed by FBR as a registered representative, and learned of the PIPE prior to the company's public announcement of the transaction on October 9, 2001. FBR informed its employees that information about the PIPE was confidential and directed those employees to take measures to maintain that confidentiality while soliciting and obtaining accredited investors to invest in CDCY through the PIPE.

Mangan spoke to his business partner Hugh L. McColl, III ("McColl")[3] about participating in the PIPE. McColl indicated his interest but did not have sufficient liquid assets for the purchase. In violation of FBR policies, Mangan agreed to loan McColl the necessary funds to invest in the PIPE and to then split equally any gain or loss. Mangan and McColl made the decision on October 8th that HLM Securities LLC ("HLM"), an entity owned by McColl, would purchase 80,000 shares of CDCY common stock through the PIPE. On October 8th at 8:49 a.m., FBR notified its sales force, including Mangan, by e-mail that pricing would occur that evening. The PIPE was priced at $12 per share between 6:00 p.m. and 7:00 p.m. after the market closed on October 8th. At the close of market on October 8th, the price of CDCY stock was $17.38 per share. The well-established practice in the industry is that public notice of a secondary

---

[2] A PIPE is a private placement to selected accredited investors (usually to selected institutional accredited investors) wherein investors enter into a purchase agreement committing them to purchase a specified number of shares at a specified price, with the closing conditioned upon, among other things, the SEC's preparedness to declare effective a resale registration statement covering the resale from time to time of the shares sold in the private placement.

[3] McColl was named as a relief defendant to this action. Pursuant to a Consent Order entered on January 9, 2007, McColl paid his share of the profits in the CDCY transactions at issue into the Court's Registry account.

offering occurs directly on the heels of pricing, before the market opens the next day. On the morning of October 9th, Mangan and McColl flew from Charlotte to Boston to attend a business meeting. The flight departed at approximately 8:10 a.m. and arrived in Boston at approximately 10:24 a.m. Sometime between 7:37 a.m. and 9:28 a.m., prior to both the opening of the market and the time of the public announcement of the PIPE, Mangan called his in-house trader, Jeff Peterson, and directed him to sell short in the HLM account 25,000 shares of CDCY.[4] However, Mangan did not instruct Peterson to execute the trade before the market opened or ask Peterson to handle the transaction in any special way. A 25,000 share trade was entered at 9:36 a.m. and was fully executed by 9:54 a.m. HLM received an average price of $14.16 per share for the transaction. The public announcement of the PIPE was not made until 11:45 a.m. Mangan claims that he was unaware of the unexpected delay in the public announcement of the PIPE. The price of CDCY immediately before the announcement was $14.50. Both experts retained by the parties opined that the stock traded in an efficient market and that the information concerning the PIPE was fully impounded in CDCY's $14.25 closing price on October 9th.

The SEC has alleged that the October 9th short sale of CDCY by Mangan prior to the public announcement was made in an effort to fraudulently take advantage of his knowledge of the PIPE. By short selling the 25,000 shares of CDCY and ultimately covering the short sale with the discounted shares purchased in the PIPE offering, Mangan received at least $54,000 in profits. The SEC claims that such alleged conduct violated 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. 77q(a), 10(b) of the Securities Exchange Act of 1934 ("Exchange

---

[4] Mangan placed two calls to his trading assistant, one at 7:37 a.m. and one at 9:18 a.m. Neither Mangan nor Peterson recall during which conversation they discussed selling CDCY.

Act"), 15 U.S.C. 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5. The SEC brought this action pursuant to §§ 20(b) and 20(d) of the Securities Act, 15 U.S.C. §§ 77t(b), t(d), and §§ 21(d) and 21A of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u-1, and seeks civil penalties, disgorgement, and injunctive relief.[5] As noted, both Mangan and the SEC have moved for summary judgment.

## DISCUSSION

Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The movant may be entitled to summary judgment merely by showing that the other side will not be able to prove an essential element of its case with respect to which it has the burden of proof. Celotex, 477 U.S. at 322-23. Moreover, "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id. at 323.

In order to prevail on its claims in this action, the SEC must show that the information concerning the PIPE was both material and nonpublic. See United States v. O'Hagan, 521 U.S. 642, 651-52 (1997) ("Under the 'traditional' or 'classical' theory of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades . . . on the basis of material, nonpublic information.") Information is material if there is "a substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor as having

---

[5] On October 25, 2007, pursuant to the Defendant's Motion to Dismiss, this court dismissed a claim by the SEC under Section 5 of the Securities Act relating to the unregistered sales of securities.

significantly altered the total mix of information made available." Greenhouse v. MCG Capital Corp., 392 F.3d 650, 656 (4th Cir. 2004) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).  While materiality is a mixed question of law and fact, the Fourth Circuit has noted that there is no shortage of cases that make clear that materiality may be resolved by a court as a matter of law.  Id. at 657.

An important issue in this case is the point at which the materiality of the nonpublic information, the CDCY PIPE offering, must be determined.  In Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876 (2d Cir. 1972), the Second Circuit approved an instruction to the jury that materiality of inside information "is to be determined as [of] the time when the parties to the transaction are committed to one another." Id. at 891.  Thus, the proper time for evaluating materiality in this matter is when both parties legally committed to the trade at issue.  See Castellano v. Young & Rubicam, 257 F.3d 171, 180-81 (2d Cir. 2001) (rejecting the argument that materiality of withheld information could be determined at a time earlier that the time at which the parties committed themselves to the transaction); Pittsburgh Coke & Chem. Co. v. Bollo, 421 F.Supp. 908, 923 (E.D.N.Y. 1976) ("Issues of non-disclosure, misrepresentation, materiality and reliance are to be determined by the knowledge of the parties at the time they committed themselves . . .."); Bonfield v. AAMCO Transmission, Inc., 717 F.Supp. 589, 592 (N.D.Ill. 1989) (materiality determined at the time both parties obligated to the transaction); Michaels v. Michaels, 767 F.2d 1185, 1195 (7th Cir. 1985) (determined materiality at the time the parties signed agreement to sell stock).  The time at which Mangan was "committed" to the transaction at issue, that is, the short sale of CDCY stock prior to the public announcement of the PIPE, was the time at which the trade was fully executed on October 9, 2001, at 9:54 a.m.  Thus,

5

the SEC must show that the information concerning the PIPE was material at this time.

Without citing any caselaw in support of its position, the SEC urges the court to evaluate the materiality of the trade at issue according to an "event window" posited by their expert witness, Dr. Susan Chaplinsky. According to Dr. Chaplinsky, the market reaction to the PIPE should be measured from the close of market on October 8, 2001, when the price was $17.38 per share, to the close of the market on October 9, when the price was $14.25. The SEC contends that this window of time takes into account the potential for leakage of the news of the PIPE that was traded upon after the closing of the market on October 8th and prior to public dissemination. The SEC alleges that the materially negative information about the PIPE offering must have leaked into the market and that trading on that information on the morning of October 9th caused CDCY's price to decline from $17.38 to $14.16 at the time Mangan executed the trade at issue. In support of this theory, the SEC argues that at least one PIPE investor in addition to Mangan, Hillary Shane, was short selling CDCY prior to the public announcement of the PIPE, thereby putting downward pressure on the stock price. The SEC, however, fails to make an adequate showing to support its argument. The only evidence submitted in support of the SEC's theory is an unsworn declaration by an SEC accountant stating that as of 9:36 a.m. and 9:54 a.m. on October 9th, Shane sold 17,900 and 50,200 shares of CDCY, respectively. There is no evidence whatsoever that such sales had anything to do with information concerning the PIPE, whether her trades exerted material downward pressure on the price of the stock, and if so, what portion of the decline was the result of leakage of the information into the market versus other market forces. The SEC's own expert, Dr. Chaplinsky, had no knowledge of any leakage other than what she had learned about the SEC's complaints against Shane and what she had read in a Wall

6

Street Journal article. In short, the SEC's inadmissible statements regarding leakage are woefully inadequate to establish an issue of material fact.[6]

Dr. Chaplinsky performed a materiality analysis of the information concerning the PIPE using her event window from the market closing on October 8th to the closing on October 9th and opined that the market reaction to the news of the PIPE was a statistically significant event that had a negative impact on CDCY stock. Defendant's expert, Dr. Marcia Kramer Mayer, performed her own analysis using the same event window as Dr. Chaplinsky to attempt to verify or dispute Dr. Chaplinsky's findings, and found that the data was insufficient to conclude that the price change from close to close was material. Dr. Mayer testified in her deposition that the most appropriate and relevant event window to measure the materiality of the information concerning the PIPE at the time of the trade at issue starts at the time of the trade on October 9th and ends at the close of market on the same day. Based upon this event window, Mayer testified that the negligible price movement of CDCY stock was immaterial. The SEC's expert did not analyze whether the price movement after the trade was material. Thus, it is undisputed that there was no materially negative movement in CDCY's price between the time of the trade and the close of the market on October 9th, when the experts agree that all the information concerning the PIPE was fully impounded in CDCY's price. In fact, all trades on October 9th after HLM's 9:54 a.m. trade were executed at a price greater than $14.16, including the closing trade at $14.25.

Many courts have held that information may be deemed immaterial as a matter of law

---

[6] Even if the SEC could offer competent evidence of "leakage" it cannot claim that the information was nonpublic while simultaneously claiming that the information caused the price to decline prior to the public announcement. See SEC v. Butler, 2005 WL 5902637, *12 (W.D.Pa. April 18, 2005) ( rejecting this same argument by the SEC as "illogical").

when the public disclosure of such information has a negligible effect on the price of a stock. See Oran v. Stafford, 226 F.3d 275, 283 (3d Cir. 2000) (dismissing the plaintiffs' claims where the public disclosure of information by the company "had no appreciable negative effect on the company's stock price"); Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997) (where the release of sales information had no appreciable effect on the stock price, the information was immaterial as a matter of law); In re Allied Capital Corp. Sec. Litig., 2003 WL 1964184, *6 (S.D.N.Y. April 25, 2003) (ten percent decline in value of stock was immaterial when viewing stock's price movements as a whole); In re Lucent Techs. Inc. Sec. Litig., 217 F.Supp. 2d 529, 543 (D.N.J. 2002) ("when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following the disclosure, of the price of the firm's stock."). The rationale for these decisions is that an efficient market is the most accurate and unbiased measure of whether reasonable investors found the information to be material. As the Third Circuit has explained:

> Ordinarily, the law defines "material" information as information that would be important to a reasonable investor in making his or her investment decision. In the context of an "efficient" market, the concept of materiality translates into information that alters the price of the firm's stock. This is so because efficient markets are those in which information important to reasonable investors (in effect, the market . . . ) is immediately incorporated into stock prices. Therefore, to the extent that information is not important to reasonable investors, it follows that its release will have a negligible effect on the stock price.

In re Burlington Coat Factory, 114 F.3d at 1425 (internal quotations omitted). This court is aware that the Fourth Circuit has not specifically opined on whether stock price history alone may determine materiality. See Greenhouse, 392 F.3d at 660-61. However, it is notable that the Fourth Circuit has found that information is immaterial as a matter of law where "it is *not*

8

substantially likely that reasonable investors would devalue the stock knowing [the information]." Id. at 661 (emphasis in original).

The stock price movement of CDCY stock from the time of Mangan's trade until the closing of the market on October 9th, when the experts agree that the information about the PIPE was fully impounded into the price, is evidence that reasonable investors did not devalue the stock following Mangan's trade. The trade at issue occurred at 9:54 a..m. at a price of $14.16 per share. Following the trade, the price rose to $14.50 immediately before the public announcement of the PIPE. The market then has a small positive reaction to the release of the PIPE information at 11:45 a.m. By 12:02 p.m., eighteen minutes after the announcement, the price had actually risen to $15.20 per share. By 3:30 p.m., the price was at $14.51, still higher than the announcement and the trade prices. CDCY closed at $14.25 that day, nine cents above the price at which Mangan traded and a mere twenty-five cents less than the price immediately before the announcement. Contrary to the SEC's allegation that the information concerning the PIPE was materially negative, the market did not devalue CDCY stock after the trade at issue.[7]

In addition to its argument about the movement of CDCY stock price, the SEC contends that the specific terms of the PIPE offering, in particular, the dilution, the large discount, and the liquidation of a long-term shareholder and diversion of proceeds, were such that there was a significant risk that investors would react negatively to the news. In support of this contention, they offer Dr. Chaplinsky's opinion that these factors individually increased the likelihood that the price of CDCY stock would decline in reaction to news of the PIPE. Dr. Chaplinsky does not

---

[7] In fact, the relative stability of the stock price on October 9th stands in stark contrast to the previous volatility of the stock price in the preceding weeks.

opine that all of the terms of the PIPE amounted to materially negative information. Instead, she selects several of the terms and opines that they, in isolation, may have spawned a negative market reaction. She fails to address the positive terms of the PIPE, such as the pay-down of millions of dollars of high-yield debt, increase in equity, and elimination of a private equity venture fund investor. Moreover, Dr. Chaplinsky's conclusions are couched in speculative terms. For example, she states in her report that "there are some additional circumstances associated with CompuDyne's PIPE offering that *may have had* added implications to investors in its stock," and that certain features of the PIPE *"increased the likelihood* that the stock price would decline." Such expert speculation as to how the market may have perceived certain pieces of information taken out of the context of the transaction as a whole is insufficient to overcome the fact that the unbiased market of reasonable investors clearly determined that the information was immaterial. Accordingly, price movement is determinative of materiality under this factual record.

As this court has noted, the materiality of the information about the PIPE is determined as of the time of the trade. It is undisputed that there was no materially negative movement in CDCY's price between the time of trade and the close of the market on October 9th. Moreover, the SEC's other evidence of materiality fails to raise a genuine issue of fact. Because the efficient market of reasonable investors did not devalue CDCY after the trade at issue and because the SEC fails to otherwise raise a genuine issue of fact as to materiality, summary judgment in favor of the Defendant is appropriate. Because the court has determined that the information about the PIPE was immaterial as a matter of law, the court need not address the issue of scienter.

IT IS THEREFORE ORDERED that the Defendant's Motion for Summary Judgment is hereby GRANTED, and the Plaintiff's Motion for Summary Judgment is hereby DENIED. Accordingly, the Clerk is directed to enter Judgment in favor of the Defendant.

Signed: August 20, 2008

Graham C. Mullen
United States District Judge